# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Cause No.: 1:08-CR-24-TS |
| | ) | |
| MATTHEW MCCHESNEY | ) | |

## OPINION AND ORDER

Before the Court is a Motion to Suppress Evidence [DE 23], filed on September 26, 2008. The Defendant, Matthew McChesney, asks the Court to exclude evidence that was recovered from a vehicle search during a March 5, 2008, traffic stop. The Defendant argues that the police searched the car, of which he was the driver, without justification or authority, when they prolonged his seizure beyond the time reasonably required to complete the mission of issuing a ticket for speeding.

## BACKGROUND

On March 26, 2008, the Defendant was charged in a six-count Indictment [DE 11] for violations of 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 924(c). On March 27, the Defendant pleaded not guilty. On September 26, the Defendant filed the present Motion [DE 23]. The Defendant then filed a series of motions to continue the evidentiary hearing, which the Court granted. The Court held an evidentiary hearing on May 5, 2009. On September 21, the Defendant filed a Brief in Support of Motion to Suppress [DE 46]. On October 23, the Government filed its Response to Defendant's Motion to Suppress [DE 47]. On November 9, the Defendant filed his reply brief [DE 48], and the Motion is now ripe for ruling.

**FINDINGS OF FACT**

Upon consideration of the testimony of the witnesses and the exhibits admitted during the evidentiary hearing, the Court makes the following findings of fact.

On March 5, 2008, Allen County Police Department Officers Earl McDonald, Jack Cain, Rod Hormann, and Warren Coonrad were conducting surveillance at a certain address on Antwerp Road in Allen Country, Indiana, near the Ohio state line. The surveillance was part of an ongoing drug investigation of the Defendant that was being conducted by the Allen Country Drug Task Force. Detectives McDonald and Cain had previously performed covert pickups of trash at the Antwerp Road residence. On November 6, 2007, the detectives had found in the trash a wad of paper towels with a green stain that smelled of marijuana. The paper tested positive for marijuana. On November 20, 2007, the detectives found in the trash a burnt marijuana cigarette and a pair of rubber gloves that smelled strongly of marijuana.

In addition to the trash sweeps, the detectives had frequently performed surveillance at the Antwerp Road address— actually, the residence had been under daily surveillance for the six months prior to the traffic stop. During the surveillance, the detectives had observed pickup trucks that were registered to McChesney and a few known associates arriving at and leaving the residence. Detective Cain had also spoken with an anonymous caller who informed him that McChesney and his associates had been involved in a multi-state drug trafficking network. The surveillance was not limited to the Antwerp Road address, but extended to twelve to fourteen other houses owned by the Defendant, whose known sources of income did not suggest an ability to own so many houses.

The Defendant had long been suspected of being a marijuana distributor. In 2001, he was

involved in picking up four hundred pounds of marijuana from an undercover police officer in Omaha, Nebraska. This investigation led to a search warrant at a McChesney residence in Fort Wayne, which yielded twenty-five pounds of marijuana, cash, and firearms. In 2006, McChesney was stopped in Illinois driving an SUV rented from Hertz—officers found in the vehicle about $11,000 in cash and marijuana residue. On February 19, 2008, weeks before the traffic stop at issue in this case, Fort Wayne resident Jason McCollister was arrested in Arizona with seven hundred pounds of marijuana. The pickup truck he was driving was registered to McChesney.

While observing the residence, the detectives encountered a white Chevrolet Equinox with an Illinois license plate and a large adult male driver.[1] The detectives followed the vehicle, and never lost sight of it. When they ran the Illinois license plate, they discovered that the plate was registered to Hertz, a rental car company. This aroused the detectives' suspicions because, in their experience, drug traffickers often rent vehicles for use in transporting drugs to hide the driver's identity, and assist in avoiding forfeiture. Additionally, in their ongoing investigation of the Defendant, they observed him using Hertz rental cars on other occasions. On the date of the search, although the detectives were not initially able to positively identify the driver as McChesney, what they saw of the driver's physical appearance and stature was consistent with McChesney's appearance and stature.

After following the vehicle, the detectives decided that "this would be a good opportunity to contact a traffic officer, make a traffic stop." (Tr. 86). The detectives contacted Officer Robert

---

[1] The Court notes a discrepancy between the testimony as to how, exactly, the detectives encountered the Chevy Equinox. Officers McDonald and Cain testified that while they were driving east on Antwerp Road, the Equinox passed them headed west. Special Agent Steven Kell stated in his Affidavit that the detectives observed the car in the driveway of the Antwerp Road address, and began following it when it backed out of the driveway. This discrepancy is immaterial as to any legal issue involved in the Defendant's Motion to Suppress Evidence.

Hatfield of the Allen County Police Department to make the stop. Hatfield was chosen because of his proximity to the scene, because of his training in drug interdiction and drug recognition, and because of his extensive training and experience in handling K-9 units. The detectives continued to follow the Equinox until Hatfield could take over the pursuit. Before handing over the pursuit, Detective McDonald told Hatfield that they believed McChesney to be the driver of the Equinox, that McChesney could be transporting marijuana or money, and that McChesney was known to carry guns "all the time." (Tr. 9–10).

Hatfield followed McChesney on State Street in Fort Wayne, Indiana, headed west in a forty mile per hour speed zone. Hatfield clocked the Defendant driving at forty-eight miles per hour, and stopped the Defendant just west of Reed Road on State Street. Upon seeing Hatfield's lights, the Defendant pulled over immediately, using his turn signal. Upon Hatfield's request, the Defendant produced a valid license and a valid rental agreement for the automobile. At the time of the stop, Hatfield was riding only with his K-9 partner, Dexter. Allen County Police Department Officer Chad Vaughn arrived shortly after the stop, responding as a backup officer. The detectives parked in a nearby parking lot.

Hatfield approached the vehicle and followed his practice of standing "back just a little bit from the driver's window so they have to actually turn in order to hand me anything." (Tr. 8–9). This is a safety technique that allows Hatfield more reaction time if a driver intends to use a gun or other weapon. While standing in this position, Hatfield believed that he detected a faint scent of marijuana. Hatfield decided not to tell the Defendant about the marijuana smell at that point because "I don't particularly want Mr. McChesney to know that I smell marijuana . . . because I'm going to look into that a little further when I come back up." (Tr. 19). The odor was

4

enough to arouse Hatfield's suspicions, and he intended to further pursue that avenue of investigation.²

After obtaining McChesney's license and rental agreement, which were valid, Hatfield went back to his car and performed a license and warrants check, and found nothing suspicious. While in his car, Hatfield wrote a speeding ticket. While writing the ticket, Hatfield spoke on the telephone to McDonald, who stressed that McChesney was often known to carry a gun.

Hatfield then exited his vehicle and again approached the Defendant's vehicle. Hatfield had the Defendant exit the vehicle to "just kind of feel [him] out." (Tr. 13). When the Defendant exited the vehicle, Hatfield detected a strong smell of marijuana, which to him smelled like unburnt marijuana. Hatfield walked the Defendant to the back of the Equinox, at which point Hatfield turned his back on the Defendant. (Video at 14:44). Hatfield asked the Defendant for consent to search the vehicle, which was not given.

At this point, Hatfield directed McChesney to wait with Officer Vaughn. Vaughn performed a patdown search of the Defendant, and retrieved a handgun. During the patdown, Vaughn smelled marijuana on the Defendant's person. During this time, Hatfield had Dexter perform a K-9 sniff of the Equinox in order to confirm the presence of marijuana. At the time of the search, Dexter was certified by the International Police Work Dog Association for marijuana

---

² The Court finds that the Defendant failed to undermine Hatfield's credibility on cross-examination. The Defendant's attempt focused on two main lines of questioning: (1) that Hatfield's police report and probable cause affidavit did not mention him smelling marijuana until the Defendant exited the vehicle, and (2) that Hatfield did not immediately engage in a search or seizure upon smelling the marijuana. However, the fact that Hatfield stated that he smelled marijuana when the Defendant exited the vehicle is not inconsistent with his detecting a faint scent of marijuana earlier in the stop. Furthermore, the Court was convinced by Hatfield's explanation that he waited to make his search and seizure in the interest of officer and public safety, as he had reason to believe the Defendant was armed. The Defendant did not present any evidence of past instances of Hatfield being impeached on the stand, nor did he bring to the Court's attention any pattern of misconduct or untruthfulness on the part of Hatfield. As such, the Court accepts Hatfield's statement that he detected a smell of marijuana when he first approached the Defendant's vehicle.

5

detection, which requires a one hundred percent accuracy rate on all tests in order to be certified. Dexter was initially certified in 1999, and has been re-certified every year since. During the sniff, Dexter alerted Hatfield to the presence of drugs inside the Equinox. At this point, Hatfield explained to McChesney that he had probable cause to look in the vehicle, and began a search. The Defendant was then handcuffed.

The detectives had been waiting in their vehicle during the stop, and were called to the Equinox after McChesney was taken into custody. Upon approaching the Equinox, both detectives smelled marijuana. Cain recalled that the scent was so strong that he thought the use of Dexter had been superfluous—any human could have smelled it (Tr. 124). In the vehicles front console, the detectives found about twenty-two grams of marijuana and a pipe with burnt marijuana. A black gym bag in the back seat contained a large amount of cash, and a black trash bag in the back area of the vehicle held about twelve pounds of marijuana. More bags of marijuana and a plastic bag containing cash were located on the floor behind the passenger seat. The total amount of cash recovered from the vehicle exceeded $165,000.

**FOURTH AMENDMENT STANDARDS**

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States,* 517 U.S. 806, 809–10 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic

violation has occurred." *Id.* at 810. Any ulterior motive an officer may have for making the stop is irrelevant. *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (citing *Whren*, 517 U.S. at 813). This is true even when the stop is performed by an officer at the request of a narcotics detective and when the ultimate motivation is to search for drugs. *United States v. Loera*, 565 F.3d 406, 411 (7th Cir. 2009). Although a seizure that is justified only by the need to issue a traffic ticket "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission," *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), information lawfully obtained during a traffic stop may provide the officer with reasonable suspicion of criminal conduct that would justify expanding the stop to permit a reasonable investigation. *United States v. Mosby*, 541 F.3d 764, 768 (7th Cir. 2008); *United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005). The use of a drug-sniffing dog during an otherwise lawful traffic stop does not implicate a defendant's legitimate privacy interests. *Martin*, 422 F.3d at 602 (citing *Caballes,* 543 U.S. at 409).

If probable cause is found during a traffic stop, the Supreme Court has consistently recognized "an automobile exception, allowing a warrantless search of a vehicle to be conducted so long as there is *probable cause* to believe it contains contraband or evidence of illegal activity." *United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004) (citing *Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999)) (emphasis added).

This Court is also cognizant that the Supreme Court has "specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977); *see also Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (noting the same risk applies "whether the occupant of the stopped car is a driver or

7

passenger"); *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (noting that "roadside encounters between police and suspects are especially hazardous"); *United States v. Denney*, 771 F.2d 318, 321 (7th Cir. 1985) ("[Investigative detentions involving suspects in vehicles at the roadsides are especially dangerous to the police officers.").

## DISCUSSION

There is no doubt in the record, and the Defendant does not dispute, that the traffic stop was appropriate at its inception based upon the Defendant's speeding violation. Rather, in his Brief in Support, the Defendant essentially makes two arguments. First, he contends that Hatfield "impermissibly extended the length of the traffic stop beyond its[] intended purpose by ordering McChesney out of the vehicle after the purpose of the stop had been effectuated." (Br. in Supp. at 6). Second, the Defendant claims that there was no justification to search the vehicle after the Defendant had exited the truck and talked to Hatfield about the ticket. In its Response, the Government makes two discrete yet interrelated arguments. It first argues that information acquired through the yearlong investigation of the Defendant justified investigation beyond the mere issuance of the speeding ticket after the Defendant exited the truck and talked to Hatfield briefly about the ticket. Alternatively, the Government argues that information acquired through Hatfield's own perception during the stop forms an independent basis for the officer extending the stop.

This Court will first address the threshold question of whether to analyze the incident as four seizures or as one. It will then analyze whether it was appropriate for the Defendant to be removed from the car. Finally, it will analyze whether the stop was appropriately extended from

8

a traffic stop to an automobile search.

A.  **Multiple Seizure Analysis**

The Defendant argues that Officer Hatfield impermissibly started a new seizure by asking him to exit the vehicle and commencing an investigation that was unrelated to the traffic stop. In other words, the Defendant asks the Court to break up the encounter into two or more different seizures, and apply a separate analysis to each. However, the Seventh Circuit has rejected this sort of multiple seizure analysis in favor of an overarching analysis that takes into account the traffic stop as a whole. In *United States v. Figueroa-Espana*, the defendant argued that once his traffic stop had been completed, any additional investigation by the police officer qualified as an improper second encounter, and any evidence produced therefrom should be excluded. The Seventh Circuit declined to adopt that framework and held that "[t]he fact that the troopers sought further information [unrelated to the traffic stop] does not render this second phase of questions a new seizure . . . . Rather, the events . . . are more appropriately analyzed as . . . an extension of the initial stop based on reasonable suspicion." 511 F.3d 696, 702 (7th Cir. 2007) (citing *United States v. Rivera*, 906 F.2d 322–23 (7th Cir. 1990) (finding that an officer's request to search a car, after giving the motorist a written warning, returning his identification, and indicating that he was free to leave, was part of a consensual encounter and not a new seizure)).

B.  **Ordering the Defendant Out of His Car**

With the law established that the stop should be treated as one incident, the Defendant must show that some aspect of the traffic stop invalidated it as a whole. He attempts to do so by

9

arguing that Officer Hatfield did not smell marijuana until he was ordered out of his car, and that his being ordered out of the car was an impermissible extension of the traffic stop. For authority, the Defendant presents his reading of *Pennsylvania v. Mimms*. 434 U.S. 106. As the Defendant correctly states, the Supreme Court in *Mimms* noted that ordering a subject of a traffic stop out of the vehicle may be justified on grounds of officer safety. By the Defendant's logic, since nothing that occurred between the time the Defendant was pulled over and the time he was ordered out of the vehicle posed a risk to officer safety, Hatfield's ordering him out of the vehicle was *per se* violative of the Fourth Amendment. Although the *Mimms* court did note officer safety as a factor that may justify ordering a driver out of the car, it cannot be read as narrowly as the Defendant wishes. In fact, as the Supreme Court explained, "We hold . . . that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment." *Mimms*, 434 U.S. at 11 n.6.

In fact, the law is well-settled that police may order a driver out of his car during a traffic stop as a matter of course. A police officer need not show any particularized fear or suspicion to do so, as any intrusion on the driver's liberty is considered *de minimus*. *Maryland v. Wilson*, 519 U.S. 408, 412 (1997). *See also United States v. Muriel*, 418 F.3d 720 (7th Cir. 2005). Because the minimal intrusion is a justifiable protective measure given the special risks and dangers that inhere in all traffic stops, this rule applies even when a driver is not armed or dangerous. *Wilson*, 519 U.S. at 413.

Because officers may order a driver out of his car during a traffic stop for any or no reason, the Court does not need to address whether Officer Hatfield had developed reasonable suspicion during the stop to extend it—the Defendant's Fourth Amendment rights were not

violated by Officer Hatfield ordering him out of the vehicle and thereby extending the seizure.

C.     **Warrantless Search of Vehicle**

With the Defendant's ejection from the truck being lawful, the lawfulness of the search turns on whether Sergeant Hatfield had probable cause to search the vehicle without a warrant. The Government offers two possible avenues for this Court to find the search lawful: (1) that when the officer smelled marijuana, he had probable cause to search the vehicle; and (2) that the ongoing drug investigation gave the officer probable cause to search. As the Court finds probable cause to search in the officer smelling marijuana, it will not address the second avenue.

The Court finds that Officer Hatfield's detecting the smell of marijuana both before and during the Defendant's exit from the vehicle provided him with reasonable suspicion to investigate the scent. The law is clear that the smell of marijuana through a car's open window provides probable cause to search the vehicle. *United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008) ("A police officer who smells marijuana from a car has probable cause to search that car.") (citing *United States v. Wimbush*, 337 F.3d 947, 951 (7th Cir. 2003)).[3]

In addition to attacking Officer Hatfield's credibility, the Defendant takes issue with Hatfield's method of investigation. Specifically, the Defendant contends that Hatfield could not have smelled marijuana at the stop's inception because he waited so long before searching the car. However, an officer is not required to take a Fourth Amendment action at the very moment that probable cause becomes present. *Mosby*, 541 F.3d at 768 (citing *Hoffa v. United States*, 385

---

[3] The Defendant does not take issue with the legal authority that the scent of marijuana gives a police officer probable cause to conduct a warrantless search of an automobile. Rather, he attacks the credibility of Officer Hatfield's assertion that he smelled the marijuana. As stated earlier in this Opinion and Order, the Court has found Officer Hatfield's testimony credible.

U.S. 293, 310 (1966); *United States v. Limares*, 269 F.3d 794, 798–99 (7th Cir. 2001)). While Hatfield had the option of doing so, he instead took a more cautious approach in choosing to minimize a potential confrontation with the Defendant, who was known to possess weapons.

In sum, because the Court accepts Hatfield's testimony that he smelled marijuana upon approaching the vehicle and upon McChesney's exiting of the vehicle, the Court finds that he had probable cause to conduct the warrantless search from the moment he approached.[4]

## CONCLUSION

For the foregoing reasons the Defendant's Motion to Suppress [DE 23] is DENIED.

So ORDERED on December 2, 2009.

    s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

---

[4] To the extent that the Defendant takes issue with the use of Dexter conducting a sniff test, the Court reiterates that the use of a drug-sniffing dog during an otherwise lawful traffic stop does not implicate a defendant's legitimate privacy interests. *Caballes,* 543 U.S. at 409.